UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARY PERKS**, and **STANLEY ALEXANDER**, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**ACTIVEHOURS, INC. d/b/a/ EARNIN**,<br><br>Defendant. | Case No.: _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Mary Perks and Stanley Alexander, individually and on behalf of all others similarly situated, hereby bring this Class Action Complaint against Defendant Activehours, Inc. d/b/a/ Earnin ("Earnin"), and alleges as follows:

**INTRODUCTION**

1. This lawsuit is brought as a class action on behalf of Plaintiffs and thousands of similarly situated Earnin customers who have been deceived into signing up for Earnin's app-based payday loan services—and paying "tips" to Earnin for such loans—by the company's misrepresentations and omissions, in marketing materials, regarding the true operation and risks of the service. These risks include the real and repeated risk of multiple insufficient funds fees ("NSF fees") or overdraft fees imposed by banks as a result of automated Earnin transfers from consumers' checking accounts.

2. Imagine the following hypothetical: A young adult lives paycheck to paycheck and struggles to make ends meet between pay periods. To pay her bills on time, she uses a service that advances $50 from her next paycheck, which the service will withdraw when her paycheck is deposited later that week. She pays a $5 "tip" for the service.

3. A few days later, the young adult's paycheck is deposited and the service withdraws the $50 plus the $5 "tip" from her account, even though it knows that her account has insufficient funds to cover the deduction and the account will incur a fee. Consequently, the

young adult's bank charges her account a $35 overdraft fee. Ultimately, the young adult paid $40—the $35 bank fee plus the $5 "tip"—to access $50 of her earnings a few days early.

4. This is precisely what happened to Plaintiff Perks.

5. Earnin is an investing app targeted at "millennials" interested in receiving payday loans when, because of difficult financial circumstances, they cannot wait for their paychecks to arrive. The app has thousands of users.

6. Here's how it works: Users allow Earnin to monitor their hourly pay and time worked so Earnin knows how much that user will receive in his or her next paycheck. Users also give Earnin their bank account information and provide Earnin direct power to deposit and withdraw funds from their bank account. Users may then use Earnin's service to advance or loan a portion of their anticipated earnings immediately after the users work the hours giving rise to those earnings. When the user's paycheck is later deposited, Earnin withdraws the advanced or loaned amount from the user's bank account, even though Earnin knows the account has insufficient available funds.

7. Earnin prominently markets itself as a service that allows users to avoid interest and bank fees. Earnin's website even promises to give users immediate access to their earnings "with no loans, fees, or hidden costs." These representations are false. In fact, huge, undisclosed fees are associated with using the service.

8. Earnin markets the app as a way for users to avoid NSF and overdraft fees from their banks, but <u>then directly causes those fees</u> by withdrawing funds when Earnin <u>knows that the user does not have sufficient funds to cover the withdrawals.</u>

9. Earnin's services thus cause unsuspecting consumers like Plaintiffs to incur significant overdraft and NSF fees on their linked bank accounts.

10. Unfortunately, Earnin's operation, along with its deceptive and incomplete disclosures, means that users like Plaintiffs end up losing huge portions of their scarce wages to bank fees, which Earnin falsely assures users they will not receive.

11. In its rush to tout itself as convenient, simple, automatic, and cheap, Earnin does not disclose that (a) overdraft and NSF fees are a likely and devastating consequence of the use of its service; and (b) a single $35 overdraft or NSF fee[1] because of an Earnin deduction runs the risk of wiping out an entire day's worth of post-tax wages. No reasonable consumer would run this risk.

12. This massive risk is known to Earnin but is omitted from all of its marketing.

13. Worse, Earnin exacerbates the overdraft and NSF fee risk associated with the service by using undisclosed processing choices that result in even <u>more</u> bank fees than users would otherwise occur.

14. Had Plaintiffs and the Class members known of the true operation and risks of the Earnin service, they would not have signed up for the Earnin app nor "tipped" any amount to Earnin.

15. The general public stands to benefit from this lawsuit. Members of the general public are deceived by Earnin's deceptive misrepresentations and omissions in marketing and disclosure materials and are induced to sign up and give Earnin access to their bank accounts.

16. Plaintiffs and the Class members have been injured by Earnin's practices. Plaintiffs bring this action on behalf of themselves, the putative Class, and the general public. Plaintiffs seek actual damages, punitive damages, restitution, and an injunction on behalf of the general public to prevent Earnin from continuing to engage in its illegal practices as described herein.

**PARTIES**

17. Plaintiff Mary Perks is a citizen and resident of New York. She has been an Earnin user since on or around summer 2018.

18. Plaintiff Stanley Alexander is a citizen and resident of Minnesota. He has been an Earnin user since on or around 2018.

---

[1] A $35 NSF Fee is an amount typically charged by banks and credit unions and is offered merely as an example of such a charge.

19. Defendant Earnin is a California corporation with its principal place of business in Palo Alto, California.

## JURISDICTION AND VENUE

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and the action is a class action in which at least one member of the class is a citizen of a different State than Defendant. The number of members of the proposed Classes in aggregate exceeds 100 users. 28 U.S.C. § 1332(d)(5)(B).

21. This Court has personal jurisdiction over the Defendant because it maintains its principal office in this District in California and regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District and in California.

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

**A.  Overview**

23. Earnin has become one of the largest app-based payday lending services. As Earnin describes itself:

> **MAGIC? ALMOST.**
> See how the Earnin app sends money straight to your bank account, without having to get your boss involved.
>
> **Share details about where you bank.**
>
> **Tell us where you work.**
>
> **Earnin uses your location to note how long you're at work.**

> **When you tap Cash Out, Earnin sends your earnings straight to your bank account.**
>
> **Your job pays you as usual, and Earnin deducts the amount you cashed out.**[2]

24. Users link their time-tracking account or digital timesheet from their employer so Earnin knows how many hours a user has worked (and thus how much that user will receive in his or her paycheck). Users may choose to ask Earnin to advance or loan a portion of their anticipated earnings after working the hours giving rise to those earnings. In order to facilitate repayment, Earnin users are induced to provide highly sensitive bank account data to Earnin so Earnin has the direct power to automatically withdraw funds from the user's checking account when the paycheck is deposited.

25. Earnin prominently touts that its service gives users "[c]ontrol of and access to your pay as soon as you've worked with no fees, interest, or hiddent costs," and that "[w]ith Earnin, there are no fees or interest."[3] These representations are false; in fact, huge, undisclosed fees are associated with using the service.

26. Indeed, the entire premise of Earnin is to provide immediate access to money and avoid bank fees. That is why consumers are shocked to discover that Earnin causes significant bank fees.

27. Using Earnin's services causes unsuspecting consumers like Plaintiffs to incur massive fees on their linked bank accounts.

28. Earnin misrepresents (and omits facts about) the true nature, benefits, and risks of its service, the functioning of which means that users face an extreme and undisclosed risk of expensive, account-depleting bank fees when using Earnin. Had Plaintiffs been adequately

---

[2] *Earnin is Teaming Up with Crew to Get You Paid Today*, Earnin, https://www.earnin.com/crew (last visited Aug. 28, 2019).
[3] *Cash Out*, *Choose What You Pay*, Earnin, https://www.earnin.com/ (last visited Aug. 28, 2019).

informed of these risks, they would not have signed up for Earnin and would not have paid "tips" for using the service.

29. As alleged herein, Plaintiffs had no idea small, automatic Earnin repayments could cause $35-each NSF Fees or overdraft fees from their banks.

**B.     Plaintiffs' Experiences**

30. When Plaintiffs signed up for Earnin and were induced to provide Earnin with their highly sensitive banking information, they reasonably believed Earnin would use that information to make repayments only when sufficient funds existed in their accounts to do so. Based on Earnin's marketing, Plaintiffs reasonably believed that no Earnin transfer from their checking accounts would be made when sufficient funds did not exist to cover the transfer.

31. Despite these reasonable beliefs, Earnin actually withdraws funds even though it knows users have insufficient funds in their accounts to cover the withdrawal. Consequently, Earnin users are regularly charged NSF or overdraft fees because of the service.

32. For example, on October 15, 2018, Plaintiff Perks requested $100 and $50 payday loans from Earnin.

33. On October 22, 2018, Earnin deducted repayments for these payday loans—plus "tips"—from Plaintiff Perks's account, even though Earnin knew or should have known that Plaintiff did not have sufficient funds to cover those transactions. As a result, each repayment incurred a $35 overdraft fee from Plaintiff Perks's bank, TD Bank.

34. To receive $150 of her paycheck one week early, Plaintiff Perks ended up paying $14 in "tips" plus two $35 NSF fees, or $84 total.

35. In May 2018, Plaintiff Alexander requested payday loans from Earnin.

36. On May 15, 2019, Earnin attempted to deduct repayments for these payday loans—plus "tips"—from Plaintiff Alexander's account, even though Earnin knew or should have known that Plaintiff did not have sufficient funds to cover the transactions. As a result, the attempted repayment incurred *two* $29 overdraft fees from Plaintiff Alexander's credit union, Baxter Credit Union.

37. On May 17, 2019, Earnin again attempted to deduct repayments—plus "tips"—from Plaintiff Alexander's account, even though Earnin knew or should have known that Plaintiff did not have sufficient funds to cover the transactions. As a result, the attempted repayment incurred *two more* $29 overdraft fees from Plaintiff Alexander's credit union, Baxter Credit Union.

38. To receive part of his paycheck early, Plaintiff Alexander ended up paying four $29 overdraft fees, or $116 total.

39. Plaintiffs Perks and Alexander had no idea Earnin transactions could cause bank fees or result in such punishingly high lending charges, and in fact Earnin misled them to think its service would not and could not cause overdraft or NSF fees.

40. Moreover, they did not know that Earnin transactions could cause multiple overdraft or NSF fees in one day due to Earnin's practice of making separate withdrawals instead of a single withdrawal.

41. No reasonable consumer would use a service that results in such high fees for short, small cash advances, or pay tips to Earnin for doing so, if the true risks of using the Earnin service had been fairly disclosed rather than affirmatively misrepresented.

**C.    Earnin's Deceptive Marketing**

42. In its marketing and promotions, Earnin describes its service as simple, convenient, and easy—a low-fee way for consumers to receive their paychecks early.

43. Earnin's marketing never warns consumers of the extreme and crushing NSF and overdraft fee risk of using the service, including the risk of incurring more than one bank fee in a single day.

44. After installation on a smartphone, Earnin's app requires access to a user's bank account, which gives Earnin an eagle-eye view into the intimate workings of a consumer's finances. Based on Earnin's marketing, reasonable consumers understand Earnin will use that power to ensure repayment deductions occur only when sufficient funds exist in the account to cover those deductions.

45. But Earnin conceals from users the punishing risk of NSF and overdraft fees on small dollar Earnin repayments and—contrary to its marketing—Earnin makes deductions when there are <u>insufficient</u> funds in its users' accounts.

46. Earnin's marketing materials—including within the app, in app stores, and on Earnin's website—never disclose these risks and material facts, instead luring consumers to sign up for and use the service with promises of ease, convenience, and bank fee avoidance.

47. Earnin specifically indicates that it will withdraw its deductions "[t]he next time your paycheck hits your bank account," the time users are least likely to have insufficient funds. Earnin's marketing materials also repeatedly and falsely promise that use of the service will <u>not</u> cause fees.

48. Earnin knows that its service is likely to cause its users to incur large bank fees: "Every year, more than $1 trillion of the money we earn is held up in the pay cycle. Yet we're the ones footing billions in overdraft fees."[4] Nevertheless, it misleadingly assures users that its service will allow them to avoid, or at least minimize, these fees: "We've found most of our members appreciate not having to pay extra fees and penalties to banks and the like—and support us and one another when they're able to do so."

49. Earnin's representations—which all users view during the sign-up process—are false and contain material omissions.

50. Earnin misrepresents the true nature, benefits and risks of the service, which targets users with an extreme and undisclosed risk of Earnin triggering expensive, earnings-depleting bank fees. Plaintiffs would not have signed up for Earnin and would not have paid "tips" for using the service if they had been adequately informed of the risks of bank fees. As alleged herein, Plaintiffs had no idea small, automatic Earnin repayments could cause $35 bank fees from their bank; they had no idea Earnin would process transactions when their accounts had insufficient funds.

---

[4] *Earnin is Teaming Up with Crew to Get You Paid Today*, *supra* note 2.

51. Earnin's marketing never discloses the most devastating risk of using the service—that days of earnings can be wiped out by bank fees associated with using the service.

### D. The Terms of Service are Substantively and Procedurally Uncionscionable

52. Buried in the fine print of Earnin's Terms of Service is one sentence that undermines the entirety of its marketing: "[Earnin] is not responsible for any overdraft fees, over-the-limit fees, or insufficient fund charges (including finance charges, late fees, or similar charges) that result from your failure to maintain a balance or available credit in the bank account that is sufficient to fund all payments you initiate."

53. This fine-print sentence contradicts the fundamental core of Earnin's marketing representations.

54. Earnin may not disclaim in hidden fine print what it advertises prominently—that it is a service that prevents bank fees.

55. Rather than disclosing the true operation of the Earnin service, Earnin issued fine print in its adhesion contract that reveals its intent to deceive consumers through misleading marketing.

56. The Agreement governing the Earnin service is provided in passing during the sign-up process, unlike the marketing that Earnin prominently displays.

57. Even if a reasonably diligent consumer could locate the relevant terms, the Earnin Agreement still fails to explain the operation of the Earnin service and conceals and omits material facts about the service.

58. In short, the Agreement omits and misrepresents the extreme overdraft and NSF fee risk associated with using Earnin, of which Earnin is aware.

## CLASS ALLEGATIONS

59. Plaintiffs bring this action individually and as representatives of all those similarly situated, on behalf of the below-defined Class (the "Class"):

> All persons who used the Earnin Service and paid tips to Earnin.

60. Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staffs.

61. This case is appropriate for class treatment because Plaintiffs can prove the elements of their claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

62. **Numerosity:** The members of the Class are so numerous that joinder of all members would be unfeasible and impracticable. The precise membership of the Class is unknown to Plaintiffs at this time; however, it is estimated that the Class number is greater than one hundred individuals. The identity of such membership is readily ascertainable via inspection of Defendant's books and records or other approved methods. Class members may be notified of the pendency of this action by mail, email, internet postings, and/or publication.

63. **Common Questions of Law or Fact:** There are common questions of law and fact as to Plaintiffs and all other similarly situated persons, which predominate over questions affecting only individual Class members, including, without limitation:

    a) Whether Earnin's representations and omissions about its service are false, misleading, deceptive, or likely to deceive;

    b) Whether Earnin failed to disclose the NSF and overdraft fee risks of using its service;

    c) Whether Plaintiffs and the Class members were damaged by Earnin's conduct;

    d) Whether Earnin's actions or inactions violated the consumer protection statutes invoked herein; and

    e) Whether Plaintiffs are entitled to a preliminary and permanent injunction enjoining Defendant's conduct.

64. **Predominance of Common Questions:** Common questions of law and fact predominate over questions that affect only individual members of the Class. The common questions of law set forth above are numerous and substantial and stem from Earnin's uniform

practices applicable to each individual Class member. As such, these common questions predominate over individual questions concerning each Class member's showing as to his or her eligibility for recovery or as to the amount of his or her damages.

65. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs and all Class members were similarly injured through Earnin's uniform misconduct as alleged above. As alleged herein, Plaintiffs, like the members of the Class, were deprived of monies that rightfully belonged to them. Further, there are no defenses available to Earnin that are unique to Plaintiffs.

66. **Adequacy of Representation:** Plaintiffs are adequate class representatives because they are fully prepared to take all necessary steps to represent fairly and adequately the interests of the members of the Class, and because their interests do not conflict with the interests of the other Class members they seek to represent. Moreover, Plaintiffs' attorneys are ready, willing, and able to fully and adequately represent Plaintiffs and the members of the Class. Plaintiffs' attorneys are experienced in complex class action litigation, and they will prosecute this action vigorously.

67. **Superiority:** The nature of this action and the claims available to Plaintiffs and members of the Class make the class action format a particularly efficient and appropriate procedure to redress the violations alleged herein. If each Class member were required to file an individual lawsuit, Earnin would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual plaintiff with its vastly superior financial and legal resources. Moreover, the prosecution of separate actions by individual Class members, even if possible, would create a substantial risk of inconsistent or varying verdicts or adjudications with respect to the individual Class members against Earnin, and which would establish potentially incompatible standards of conduct for Earnin and/or legal determinations with respect to individual Class members which would, as a practical matter, be dispositive of the interests of the other Class members not parties to adjudications or which would substantially impair or impede the ability of the Class members to protect their

interests. Further, the claims of the individual members of the Class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto.

**FIRST CAUSE OF ACTION**
**Violation of the Consumer Legal Remedies Act**
**[California Civil Code §§ 1750, *et seq.*]**

68. Plaintiffs re-allege and incorporate the foregoing paragraphs as though fully set forth herein.

69. The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA"), was designed and enacted to protect consumers from unfair and deceptive business practices. To this end, the CLRA sets forth a list of unfair and deceptive acts and practices in California Civil Code § 1770.

70. Plaintiffs and each member of the Class are "consumers" within the meaning of California Civil Code § 1761(d).

71. Plaintiffs and the Class members engaged in "transactions" with Earnin within the meaning of California Civil Code § 1761(e).

72. Plaintiffs have standing to pursue these claims because they have suffered injury in fact and a loss of money and/or property as a result of the wrongful conduct alleged herein.

73. Defendant violated and continues to violate California Civil Code §§ 1770(a)(5), (a)(9), (a)(14), and (a)(19).

74. Defendant continues to violate the CLRA and continues to injure the public. Plaintiffs seek injunctive relief on behalf of the general public to prevent Defendant from continuing to engage in these deceptive and illegal practices. Otherwise, Plaintiffs, the Class members, and members of the general public may be irreparably harmed and/or denied effective and complete remedy.

75. Defendant had a duty not to mislead consumers about the Earnin service, including practices which cause and increase the number of NSF and overdraft fees, and these

facts were material in that a reasonable person would have considered them important in deciding whether or not to invest with the Earnin app.

76.  Defendant's concealment, omissions, misrepresentations, and deceptive practices, in violation of the CLRA, were designed to induce and did induce Plaintiffs and Class members to sign up for, use, and pay "tips" to Earnin.

77.  Defendant's acts, practices, representations, omissions, and courses of conduct violate the CLRA in that, among other things, Earnin: violated and continues to violate § 1770(a)(5); violated and continues to violate § 1770(a)(9) because Defendants knowingly advertise(d) services with intent not to sell them as advertised; violated and continues to violate § 1770(a)(14); and violated and continues to violate § 1770(a)(19).

78.  Defendant's acts and practices, undertaken in transactions intended to result and which did result in the payment of "tips" by consumers, violate § 1770 and caused harm to Plaintiffs and Class members.

79.  In accordance with California Civil Code § 1780(a), Plaintiffs and the Class members seek injunctive and equitable relief on behalf of the general public for violations of the CLRA, including restitution and disgorgement.

80.  Plaintiffs' affidavits stating facts showing that venue in this Court is proper pursuant to California Civil Code § 1780(c) is attached hereto as **Exhibit A**.

81.  In conjunction with the filing, Plaintiffs' counsel mailed Earnin a notice of its violations of California Civil Code § 1770 in accordance with California Civil Code § 1782. Plaintiffs reserve the right to amend this Complaint after thirty (30) days to seek all available damages under the CLRA on behalf of themselves and the Class.

82.  Additionally, Plaintiffs seek injunctive relief on behalf of themselves and the general public to prevent future consumers from being misled by Defendant's deceptive misrepresentations and omissions.

## SECOND CAUSE OF ACTION
### Violation of California's Unfair Competition Law
### [Cal. Bus. & Prof. Code § 17200, *et seq.*]

83. Plaintiffs re-allege and incorporate the foregoing paragraphs as though fully set forth herein.

84. Plaintiffs and members of the Class have standing to pursue a cause of action against Defendant for unfair and/or unlawful business acts or practices because they have suffered an injury-in-fact and lost money due to Defendant's actions and/or omissions as set forth herein.

85. Defendant's conduct is unlawful under Business & Professions Code § 17200 because it violates the CLRA, as discussed above.

86. Defendant's conduct as alleged herein constitutes a fraudulent business practice within the meaning of Business & Professions Code § 17200, *et seq.*, through both its affirmative misrepresentations and material omissions. Such representations and omissions misled the Plaintiffs and Class members and are likely to mislead the public.

87. Defendant's conduct alleged herein is "unfair" under Business & Professions Code § 17200 because it is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, and any utility of such practices is outweighed by the harm caused to consumers, including to Plaintiffs, the Class, and the public.

88. Defendant knew or should have known that its representations were false, deceptive, and misleading.

89. There were reasonably available alternatives to further Defendant's legitimate business interests.

90. Reasonable consumers had no way of knowing that Defendant was engaged in false, deceptive, and misleading advertising, and therefore could not have reasonably avoided the injuries that they suffered.

91. Defendant's wrongful conduct is ongoing and part of a pattern or generalized course of conduct repeated on thousands of occasions yearly.

92. Pursuant to Business & Professions Code § 17203, Plaintiffs seek an injunction on behalf of themselves and the general public enjoining Defendant from continuing to engage in the unfair competition alleged above, or any other act prohibited by law, to prevent future consumers from being misled by Defendant's actions.

93. Plaintiffs also seek rescission and an order requiring Defendant to make full restitution and to disgorge its ill-gotten gains wrongfully obtained from members of the Class as permitted by Business & Professions Code § 17203.

94. Additionally, Plaintiffs and the Class members seek an order requiring Defendant to pay attorneys' fees pursuant to California Civil Code § 1021.5.

## **PRAYER**

WHEREFORE, Plaintiffs demand judgment in their favor, and seek an order from the Court:

a) certifying the proposed Class defined herein;

b) appointing Plaintiffs as Class Representatives;

c) appointing Plaintiffs' counsel as Class Counsel;

d) declaring Defendant's conduct to be unlawful;

e) issuing public injunctive relief on behalf of the general public enjoining Defendant from engaging in the false and deceptive conduct alleged above;

f) awarding restitution as a result of the wrongs alleged herein;

g) awarding disgorgement of the ill-gotten gains derived by Earnin from its misconduct;

h) requiring Defendant to restore to Plaintiffs and members of the Class any monies, with interest, that were acquired by means of their false and deceptive advertising;

i) awarding actual compensatory, direct, and consequential damages;

j)  awarding statutory damages, punitive damages and/or treble damages as the Court deems appropriate;

k)  awarding pre-judgment interest at the maximum rate permitted by applicable law;

l)  requiring Defendant to pay Plaintiffs' attorneys' fees and costs; and

m)  granting such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby request a trial by jury for all matters so triable in this action.

Dated: September 3, 2019

Respectfully submitted,
/s/ Jeff Kaliel
Jeffrey Kaliel (CA Bar No. 238293)
Sophia Goren Gold (CA Bar No. 307971)
KALIEL PLLC
1875 Connecticut Ave. NW 10th Floor
Washington, D.C. 20009
(202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com


Lynn A. Toops*
Lisa M. La Fornara*
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Fax: (317) 636-2593
ltoops@cohenandmalad.com
llafornara@cohenandmalad.com

*Pro Hac Vice Motions to be Filed